Denise LEADINGHAM, on behalf of Lacey Danielle SMITH, Appellant,

v.

Jeffrey S. SMITH, Appellees.

No. 2000–CA–001533–DG.

Court of Appeals of Kentucky.

Sept. 7, 2001.

---

C. David Mussetter, Ashland, KY, for Appellant.

Mary Hall Sergent, Ashland, KY, for Appellee.

Before HUDDLESTON, KNOPF and TACKETT, Judges.

### OPINION

HUDDLESTON, Judge.

The ties of common names and kindred blood and the affection that flows from these strong ties has fueled the controversy before us.

Denise Leadingham, the mother of Lacey Danielle Smith, appeals a circuit court order that reversed a district court judgment that changed Lacey's surname to Smith–Leadingham.

Lacey, a minor, was born of the marriage of Jeffrey S. Smith and Denise.

When Lacey was two years old, the marriage was dissolved and Denise was granted custody of Lacey. Subsequently, Jeffrey, who was in the Navy, relocated to Alaska, California and Georgia.[1] Denise married Charles Leadingham when Lacey was about five years old and Denise took Leadingham as her surname. Jeffrey has also remarried.

According to Lacey, one day, prior to July 30, 1999, a teacher called her home and asked to speak with Mrs. Smith. This call prompted Lacey to begin thinking about the differences in her surname and her mother's. Lacey said that she was bothered by the fact that she and her mother no longer shared the same surname. Lacey spoke with her mother about the possibility of changing her surname after learning that it was possible to do that legally.

Lacey said that although she was a Smith, and wanted to retain her father's name, she also wanted her name to be associated with both her father's and her mother's surnames. Lacey also said that by using a hyphenated surname she would keep the identity of both parents.

Jeffrey was unconditionally opposed to the name change. He said that Lacey was born a Smith, was never a Leadingham and would never be a Leadingham.

The district court concluded that changing Lacey's surname from Smith to Smith–Leadingham would not result in the forfeiture of Jeffrey's right to have his daughter bear his name since the petition specifically requested that his surname remain a part of Lacey's name. The district court also concluded that not granting the request for a name change would violate the public policy favoring preservation of the family relationship because the family relationship between Lacey and Denise would

---

1. According to the petition for name change, Jeffrey now lives in Ohio.

suffer as a result of the difference in their surnames. The district court observed that Denise's remarriage had created a new family relationship within which Lacey has been raised. The district court said that Lacey's decision to use the surnames of both her parents was in accord with public policy in this day and age of divorced parents and preserved the family relationship with both her mother and father.

The circuit court reversed the district court's order, stating that the case of *Likins v. Logsdon*[2] is controlling. The court said that to defeat a divorced father's right and interest in having his children bear his name substantial reasons must exist to do so, and that mere inconvenience is insufficient as a matter of law. In sum, the circuit court determined that the reasons given for the proposed name change fell short of the "substantial reasons" standard.

■■■ This Court has been provided with no record of the proceedings conducted by the district court.[3] Both parties attempt to supplement this missing record with statements of fact in their briefs. However, we must ignore all such references since this Court may not consider statements in the briefs that are not supported by the record.[4] "[I]n the absence of the evidence heard by the trial court, [this Court will assume] that the evidence which was heard was sufficient to sustain *the findings* of that court."[5] However, even without the district court record we still must decide whether the circuit court's reversal was correct. In sum, "[t]here must be sufficient evidence to permit the [required, legal] *conclusion.*"[6]

■■■ To the extent that this case involves a proposed surname change that combines a divorced father's surname and a step-father's surname, it is a case of first impression for this Court. Neither party directs our attention to a Kentucky case with similar facts, and we have been unable to find one. We have, however, found one case from another jurisdiction that presents similar facts. In *Robinson v. Hansel,*[7] the proposed name change was from the divorced father's surname to a combination, but not by hyphenated form, of the divorced father's surname and the step-father's surname. Jeanine Hansel Robinson sought to change the surnames of her four minor children by adding to their surname the surname of her present husband, Bruce Robinson. Jeanine and Richard Hansel, the children's natural father, were divorced in 1969 and Jeanine had married Robinson in 1970.

The court below had granted the petition in favor of the mother, ordering that the children's surname be changed from "Hansel" to "Hansel Robinson." In reversing the lower court's order, the Supreme Court of Minnesota established as

---

2. Ky., 793 S.W.2d 118 (1990).

3. According to a notice filed with this Court on August 21, 2000, the tapes of the district court proceedings are unavailable, having apparently been misplaced.

4. *See National Life & Accident Ins. Co. of Nashville, Tenn. v. Bond,* Ky., 351 S.W.2d 55 (1961). The parties did not avail themselves of the right to prepare a narrative statement of the evidence pursuant to Ky. R. Civ. Proc. (CR) 75.15.

5. *Clay v. Clay,* Ky., 424 S.W.2d 583, 584 (1968) (citations omitted)(emphasis supplied).

6. *E.W. Scripps Co. v. Cholmondelay,* Ky.App., 569 S.W.2d 700, 704 (1978) *quoting St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)(emphasis supplied); Ky. R. Civ. P. (CR) 59.01(h).

7. 302 Minn. 34, 223 N.W.2d 138 (1974).

the standard of review: "[T]hat judicial discretion in ordering a change of a minor's surname against the objection of one parent should be exercised with great caution and only where the evidence is clear and compelling that the substantial welfare of the child necessitates such change."[8] The court found the evidence supporting the petition for change of name to be neither clear nor compelling.

A similar issue, under different facts, was addressed by the Supreme Court of Ohio.[9] The name change sought was to have the mother's maiden name added to the daughter's last name in hyphenated form. The Supreme Court of Ohio held "that when deciding whether to permit a name change for a minor child . . . the trial court must consider the best interest of the child in determining whether reasonable and proper cause has been established."[10]

"The term 'surname' comes from the French word 'surnom'—'sur' meaning above or beyond, 'nom' from the Latin 'nomen,' meaning name."[11] "The use of surnames is a relatively recent practice. 'In the early life of all races surnames were unknown, while given names have been used from the most distant times to identify and distinguish a particular individual from his fellows.'"[12] "Surnames are said not to have been used in England until the Norman Conquest [in 1066] and have come into general use only toward the end of the 14th century, after Henry VIII established regulations governing the recording of births, marriages and deaths."[13] As a convenience to the feudal system, to accommodate the feudal lord in identifying sons of the soldiers most loyal to him, the naming of sons after their father was a custom the Normans brought with them to England.[14]

However, patronymics, a name derived from that of the father, was neither compelled or universal:

Inquiry into the naming practices of Western societies demonstrates that names ordinarily express kinship, but not necessarily paternity. Matronymics, names derived from the maternal line, have been employed in several Western cultures, including modern Spain and medieval England. In England, at least as late as the fourteenth century, both sons and daughters adopted their mothers' surnames, often upon succeeding to their mothers' estates or in hopes of doing so. Men also adopted their wives' surnames if the couple inherited property from the woman's family. The children of such couples presumably also took their mothers' surnames. Even among the non-propertied classes, children sometimes used the maternal surnames. Historian and linguist C.M. Matthews explained the custom:

An illegitimate boy might be called by his mother's name, but it was equally natural and useful to refer to the son of a highly respected widow in the same way, or even, when the father was alive but away for years on some distant expedition or married to a dominant wife,

8. *Id.,* 223 N.W.2d at 140.

9. *In re Willhite,* 85 Ohio St.3d 28, 706 N.E.2d 778 (1999).

10. *Id.,* 706 N.E.2d at 782.

11. *Gubernat v. Deremer,* 140 N.J. 120, 657 A.2d 856, 859 (1995) (citation omitted).

12. *Id.* (citation omitted).

13. *In re Shipley,* 26 Misc.2d 204, 205 N.Y.S.2d 581, 586 (Sup.Ct.1960).

14. *See Gubernat, supra,* n. 11.

the lad might be spoken of ... as belonging to Moll or Alison or Margery.

The paternal surname, even if initially bestowed, did not necessarily survive the father's absence. Many of these English matronymics are still in use. As many as one-tenth of contemporary English surnames of relationship (as contrasted to those derived from names of places or occupations) were originally matronymics.[15]

The flexibility in naming practices, evident in the history and customs of Western society, goes a long way in explaining why

> [t]his jurisdiction recognizes the common law right of any person to informally change their name by public declaration. [Kentucky Revised Statutes] Chapter 401 is not intended to abrogate the common law, but merely to insure that a permanent record is made of the name change. Therefore, even a child, on his own initiative, may exercise the common law right. However, he may not do so pursuant to statute because the statutory right is vested in the parent.[16]

However, the common law right is restricted by Kentucky Revised Statute (KRS) 401.020 which, in relevant part, provides that:

> Both parents, provided both are living, or one (1) parent if one (1) is deceased, or if no parent is living, the guardian, may have the name of a child under the age of eighteen (18) changed by the District Court of the county in which the child resides. However, if one (1) parent refuses or is unavailable to execute the petition, proper notice of filing the petition shall be served in accordance with the Rules of Civil Procedure.

Because KRS 401.020 provides for mandatory notice and an implied right to be heard, the Supreme Court in construing its decision in *Blasi v. Blasi*[17] said that a divorced father has an implied right to have his children continue to bear his name unless such right has been forfeited by his own misconduct or other extraordinary circumstances.[18] "Clearly the father has a right and a protectable interest in having his child bear his name which is not forfeited on insubstantial grounds."[19]

> The best interest of the child as well as that of the father is involved in maintaining the relationship with the divorced father fostered by bearing his name, unless, of course, there are substantial reasons to the contrary, and these reasons do not include mere inconvenience and the desires of a child generating from the hostility of a custodial parent.[20]

■ "The best interest of the child is [not] reduced to a simple question of the child's wishes in the matter, regardless of how strongly expressed, and regardless of claims of inconvenience attaching to the use of the divorced father's name."[21] "We require a parent seeking to attenuate the relationship between the former spouse and his child to present objective and substantial evidence of just cause and significant detriment to the child before the child's name is changed where the petition

---

15. *Id.*, 657 A.2d at 860–61 (citation omitted).

16. *Burke v. Hammonds,* Ky.App., 586 S.W.2d 307, 308 (1979) (citation omitted).

17. Ky., 648 S.W.2d 80 (1983).

18. *See Likins v. Logsdon, supra,* n. 2.

19. *Id.* at 122.

20. *Id.*

21. *Id.*

for change of name is contested." [22] This standard is to apply when a petition is tendered to change the name of a child of divorced parents.[23]

Based upon the facts found by the district court, we agree with the circuit court's conclusion that the reasons stated for the name change by the district court fell short of the "substantial reasons" standard required under *Likins v. Logsdon.*

The dissent objects to the continued use of the standard announced in *Likins v. Logsdon.* While we recognize that the Kentucky General Assembly has not acted to adopt statutorily the standard set forth in *Likins,* what the dissent fails to recognize is that the General Assembly's failure to adopt or reject the standard set forth in *Likins* is precisely why this Court cannot embark on setting new standards.

First, the Supreme Court announced this standard in *Likins.* As the dissent correctly points out, the General Assembly did not provide a standard for review in KRS 401.020. In the absence of a standard, the Supreme Court was well within its powers to announce and apply a standard for reviewing cases under KRS 401.020.

This Court has limited powers. "The Court of Appeals is bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court." [24] Therefore, even if this Court were inclined to abandon the "substantial grounds" test announced in *Likins,* we are not so empowered.

■■■ We agree with the dissent that Kentucky family law has evolved in recent years. This evolution has occurred by way of judicial and legislative action. However, KRS 401.020 has remained unchanged since 1980. The General Assembly is presumed to know the status of the law at the time a statute is enacted.[25] "It is to be presumed, also, that the legislature is acquainted with the law, that it has knowledge of the state of the law on subjects on which it legislates, and that it is informed of previous legislation and the construction that previous legislation has received." [26]

Therefore, "[i]f the General Assembly had a contrary intention, as [the dissent] suggests, it has had ample opportunity to amend the statute, but has not done so." [27] In fact, the statute has remained unchanged for more than ten years following the Supreme Court's decision in *Likins,* which established the standard for reviewing cases brought under KRS 401.020. Thus, we must presume that the legislature intended to leave in force the legal standard announced in *Likins.*[28] Any action to change the present standard in Kentucky is best left to the Supreme Court or the General Assembly.

Admittedly the proposed name change would allow Lacey to enjoy greater identification with her blended family. However, we doubt that the circuit court's order

**22.** *Id.*

**23.** *Cf. Hazel v. Wells,* Ky.App., 918 S.W.2d 742 (1996)(This Court has recognized a different standard when children are born out of wedlock. When a child is born out of wedlock "the only factor relevant to the determination of what surname a child should bear is the best interest of the child").

**24.** SCR 1.030(8).

**25.** *See Commonwealth Dep't of Banking and Securities v. Brown,* Ky. 605 S.W.2d 497, 498 (1980).

**26.** *Commonwealth v. Boarman,* Ky.App., 610 S.W.2d 922, 924 (1980), *citing Button v. Hikes,* 296 Ky. 163, 176 S.W.2d 112 (1943).

**27.** *Epling v. Four B & C Coal Co.,* Ky.App., 858 S.W.2d 216, 219 (1993).

**28.** *See id.*

will affect her relationship with her mother and her step-father. If their relationship is based on love, and we presume that it is, then no harm to this relationship will likely flow from this order. Lacey had used the surname of Smith for more than twelve years when her mother filed this petition. She made clear that the proposed change was her preference. However, the discomfort and anxiety that Lacey may have experienced after the teacher called and asked to speak to Mrs. Smith is not a "substantial reason" to grant a name change. Even her desire to retain her father's surname in combination with her mother's current surname is insufficient reason to grant the name change.

While there apparently was some testimony that implied that Jeffrey harbored some hostility regarding the relationship between himself, Denise and Lacey, this unfortunate situation, if true, is not enough to overcome Jeffrey's right to have Lacey bear his name. Evidence of this hostility was not conclusive enough for the district court to make specific findings of fact on the issue.

■ "The policy of the law is to discourage using children as weapons against a former spouse to the extent that it is possible to do so." [29] Since Denise filed this action, she, in effect, fired the first shot in this dispute. The fact that Jeffrey may have aggressively defended his rights is only to be expected under the circumstances.

■ Another question presented is whether a hyphenated surname that does not eliminate the surname of the divorced father is a name change under KRS 401.020. Denise argues that a surname that combines a divorced father's surname and a step-father's surname is a mere modification, and since the modification will not eliminate the natural father's surname from the child's surname the applicable standard should be different. The argument is novel, but unpersuasive.

Denise petitioned the district court under KRS 401.020, a statute which expressly provides the mechanism for a name *change*. The form used for the petition is entitled "Petition for Name Change." If a name modification is not a name change, then we find it difficult to imagine how Denise could bring this case under the statute, which speaks only to a name change and not to a "modification."

■ Change is "[a]n alteration; a modification or addition; substitution of one thing for another." [30] We agree with other jurisdictions that when a surname is modified to a hyphenated surname that includes the father's surname such a modification is a name change.[31]

Even were we to assume that modification is distinctly different from wholesale change, we are inclined to maintain the standards used in these cases. From the divorced father's perspective, whether the change is a mere modification, as suggested here, or a wholesale change, the change is no less damaging to his right to have his children maintain his name. While the proposed name change would not be a complete forfeiture of Jeffrey's right to

29. *Likins v. Logsdon, supra,* n. 3 at 122.

30. BLACK'S LAW DICTIONARY 231 (6th ed. 1990).

31. *Hayhurst v. Romano,* Fla. Dist Ct.App., 703 So.2d 1178 (1997); *In re Grimes,* 530 Pa. 388, 609 A.2d 158 (1992); *Brydl v. Andrews,* 235 Neb. 170, 454 N.W.2d 488 (1990); *Lawrence v. Lawrence,* 74 Md.App. 472, 538 A.2d 779 (1988); *Gershowitz v. Gershowitz,* 112 A.D.2d 67, 491 N.Y.S.2d 356 (1985); *In the Matter of Dennis,* Minn., 309 N.W.2d 298 (1981); *Laks v. Laks,* 25 Ariz.App. 58, 540 P.2d 1277 (1975).

have Lacey bear his name, this right is his to the exclusion of all others.[32]

Therefore, we decline the invitation to announce different applicable standards for name modifications of this type.

The district court's interpretation of public policy concerns us. The district court rejected Jeffrey's argument that changing Lacey's name would violate the express statement of public policy of KRS 403.110 favoring the preservation of family relationships by saying: "To the contrary, by not granting the request for a name change, the family relationship between the child and the mother suffers as a result of the difference in their last names." The district court conceded that the marriage of the mother created this difference, but said that this event has created a new family relationship within which this child has been raised.

KRS 403.110 defines the purposes of the statutes concerning dissolution of marriage. These purposes are not about the relationships formed by subsequent marriages. The family relationship that the statute serves to strengthen and preserve is the relationship of the divorced parents and their children. Similarly, the family relationship that the law seeks to protect in cases brought under KRS 401.020 is the relationship of divorced parents and their children. Here, the relationship between Jeffrey and Lacey is at risk if the proposed name change is approved.[33]

We are additionally concerned with the district court's gratuitous announcement of "public policy" when it said Lacey's decision to use the current names of both her parents clearly meets public policy, in this day and age of divorced parents, in preserving the family relationship with both her mother and her father. We find no basis in the statutes or case law for such a statement. "Public policy is an unruly horse which courts are loath to ride unless it is necessary."[34] We are aware of no evolving standards of public policy that contravene a divorced father's ability to exercise and defend his rights.

"It is elementary that the legislative branch of government has the prerogative of declaring public policy and that the mere wisdom of its choice in that respect is not subject to the judgment of a court."[35] The district court is not "em-

---

**32.** This statement is not without basis. *See Likins* at 122. ("Clearly the father has a right and a protectable interest in having his child bear his name which is not forfeited on insubstantial grounds.")

The right is not one that arises because of Jeffrey's status as a father or a male. The right arises because Jeffrey was "the parent" who refused to consent to the proposed name change. *See* KRS 401.020. For example, suppose Jeffrey had petitioned to change Lacey's surname and Denise, as a parent who refused to consent to a proposed name change, demanded a hearing to oppose the change. Under those circumstances, Denise, *as an objecting parent* (not as a mother or a female) would have had the statutory right to oppose any proposed name change.

It is the right to object and to have a hearing on the question under the standard enunciated in *Likins* that is the right the objecting parent has to the exclusion of all others. While it may or may not be customary for a father to request such a change and to have a mother object, it is possible.

**33.** *Likins v. Logsdon, supra,* n. 2, at 122 ("No one can seriously argue that changing a child's name from that of his natural father to that of his step-father could not weaken the emotional bond between the child and his father, or that such a change would necessarily be in the child's best interest") (citations omitted).

**34.** *Hennis v. B.F. Goodrich Company,* Ky., 349 S.W.2d 680, 681 (1961).

**35.** *Fann v. McGuffey,* Ky., 534 S.W.2d 770, 779 (1975); *see also Reda Pump Co. v. Finck,* Ky., 713 S.W.2d 818 (1986).

powered to rewrite statutes to suit [its] notion of sound public policy when the General Assembly has clearly and unambiguously established a different notion." [36]

The order from which this appeal is taken is affirmed.

KNOPF, Judge, CONCURS.

TACKETT, Judge, DISSENTS:

TACKETT, Judge, DISSENTING:

I respectfully dissent and would affirm the Boyd District Court. Lacey Smith is the child of Jeffrey Smith and Denise Leadingham who divorced when she was two years of age. Denise Leadingham was awarded custody of Lacey and she has resided with her mother and stepfather, Charles Leadingham, since she was five years old. Jeffrey Smith, the child's father, served in the Navy following the divorce and had little contact with his daughter. Over the course of years Jeffrey Smith also remarried and had another child from his second marriage. Lacey, at the age of twelve, became concerned about the fact that she alone in her household of four bore the surname "Smith."

Seeking to legally change her name she asked her mother to file a petition in district court to change her name from Smith to Smith–Leadingham.

In testimony to the district court, Lacey acknowledged that she wanted to keep her father's surname, but also wanted to be associated with her mother by using the surname she had taken when she remarried, Leadingham. Lacey wanted to demonstrate her ties of identity to both her mother and her father by this change. The district court granted the petition, reasoning that the name change did not violate public policy considerations, an issue raised by her father, Jeffrey Smith. The circuit court reversed the district court's order granting the name change, and the majority has affirmed the circuit court's decision.

The majority bases its holding on the decision made in *Likins v. Logsdon,* Ky., 793 S.W.2d 118 (1990). The district court in *Likins* had allowed two children to change their surname from that of their natural father to that of their stepfather, requiring only that the change be shown to be in their best interest. The Supreme Court held that such a name change did not require the standard of best interest of the child, but rather a showing, by clear and convincing evidence, that substantial grounds existed in order for the natural father to forfeit his right to have his children bear his name. Two factors are involved here, one being the application of the holding in *Likins* and two, the omission of a standard in KRS 401.020, which governs when a child will be permitted to effect a name change. It is difficult to understand how the majority applies *Likins* to this case of first impression. In the case *sub judice,* Jeffrey Smith has *not* forfeited his right to have Lacey bear his name. Her petition seeks to bear her father's surname as she always has with the mother's surname added to it. No surname has been forfeited. Therefore, the standard of substantial grounds in *Likins* does not apply in the way the majority suggests. Furthermore, the standard that has been used consistently throughout family law is the best interest of the child, even in name change matters for children born out of wedlock as the majority points out, except for termination of parental rights.

---

**36.** *Sutton v. Transportation Cabinet, Commonwealth,* Ky.App., 775 S.W.2d 933, 934 (1989); *see also Ford Motor Credit Co. v. Webb–Elkhorn Coal Corp.,* Ky.App., 775 S.W.2d 945 (1989).

Justice Wintersheimer's reasoning regarding the use of the best interest of the child standard in such cases is contained in the following portion of his dissent in the *Likins* case:

> Kentucky recognizes the common law right of any person to informally change their name by public declaration. Even a child may exercise such common law right, but the child may not do so pursuant to statute because the statutory right is vested in the parent. *Burke v. Hammonds*, Ky.App., 586 S.W.2d 307 (1979). K.R.S. Chapter 401 is not intended to abrogate the common law but merely to assure that a permanent record is made of the name change. *Burke, supra*. K.R.S. 401.020 gives exclusive jurisdiction over name changes to the district court. *Blasi v. Blasi*, Ky., 648 S.W.2d 80 (1983). The statute does not provide guidance to the district court as to what standard should be used in considering such petition.... Certainly any natural father has a protectable right to have his child bear his name, but the best interest of the child is an important test in considering a request for a name change.... [I]f the best interests of the child can be used to determine custody pursuant to K.R.S. 403.270, why should the best interests of the child not be used to determine the name of the child where there is conflict between one of the natural parents and the [child]....

Although a natural father may have a protectable right to have his child bear his name, a change in last name does not amount to a termination of parental rights. Only the extreme measure of termination has been held to justify a more stringent standard. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *NS v. C & MS*, Ky., 642 S.W.2d 589 (1982).

> In matters concerning child custody following a divorce, the best interest of the child is the paramount consideration despite the fact that the rights of the parents are necessarily involved.... Although a number of other jurisdictions have chosen to enact statutory standards encompassing the "clear and convincing" standard, Kentucky has not. It is clear that the general assembly has left the application of K.R.S. 401.020 to the sound discretion of the district court. This Court should not legislate by judicial fiat.

*Likins v. Logsdon*, Ky. 793 S.W.2d 118, 124 (1990).

Now in 2001, and more than a decade since *Likins*, the Kentucky General Assembly has not acted to adopt the statutory standard set forth in *Likins*. However, numerous jurisdictions have chosen the best interest of the child standard. It is troublesome to me that this Court fails to recognize Lacey's position and her say in matters with reference to her relationships with her mother and father. If her parents were currently in dissolution proceedings, the circuit court would be required to consider Lacey's sworn testimony regarding custody pursuant to KRS 403.270(1)(b), prior to determining with whom she would live. Importantly, our courts have recognized that *a child possesses the common law right to change his/her name* by public declaration. No action of ours can prevent Lacey from asking to be called Lacey Smith–Leadingham.

The majority opinion further goes on to state that Jeffrey Smith's right to have Lacey bear his name is "his to the exclusion of all others." To state that a divorced father has a right, to the exclusion of his child's mother, to have the child bear his surname is outdated and ignores the rights of both the mother and the child. KRS 401.020 simply states that if one par-

ent refuses to grant the other parent's wishes in seeking a name change, then the other parent must be given notice that the petition has been filed. Nothing in KRS 401.020, *Likins*, or *Blasi*,[37] which recognize a divorced father's right to have his children bear his name, makes any mention of excluding the mother's or the child's rights. In the more consequential matters of child custody, our statutes provide that "equal consideration shall be given to both parents." KRS 403.270(2). Kentucky's family law has evolved in recent years to recognize the equality of both parents in matters relating to their children. For example, the tender years presumption that previously awarded custody of very young children to the mother has given way to a father's right to have custody of very young children as set forth by statute in recent years[38]. To hold that both parents have equal rights when being considered for child custody, but that only a divorced father has the right to have a child bear his surname is archaic and fundamentally flawed. At one point the majority opinion explains that it was Denise Leadingham who chose to remarry and integrate Lacey into a new, blended family. The majority's seeming frustration with this problem only serves to perpetuate the bias that exists since it ignores the fact that Jeffrey has also remarried and fathered another child in his new family—one that does not include Lacey, and the considerations of her psychological and emotional well-being, in its day-to-day functioning.

For Kentucky, as mentioned, this case is one of first impression wherein a child of divorced parents is seeking to hyphenate her surname with that of her remarried mother. Recently, the Supreme Court of Ohio, however, dealt with a similar issue when it decided *In re Willhite*, 85 Ohio St.3d 28, 706 N.E.2d 778 (1999). In *Willhite*, a divorced mother sought to have her daughter's surname changed to Williams–Willhite to reflect the fact that she had restored her maiden name of Williams after the divorce. The Ohio Supreme Court, in reversing the ruling of the Court of Appeals of Hamilton County, stated as follows:

> [W]e hold that in determining whether a change of a minor's surname is in the best interest of the child, the trial court should consider the following factors: the effect of the change on the preservation and development of the child's relationship with each parent; the identification of the child as part of a family unit; the length of time that the child has used a surname; the preference of the child if the child is of sufficient maturity to express a meaningful preference; whether the child's surname is different from the surname of the child's residential parent; the embarrassment, discomfort, or inconvenience that may result when a child bears a surname different from the residential parent's; parental failure to maintain contact with and support of the child; and any other factor relevant to the child's best interest.

Applying these factors, in view of the more appropriate standard of best interest of the child, Lacey should be granted her longer, hyphenated name, as requested, and the decision of Boyd District Court

---

**37.** *Blasi v. Blasi*, Ky., 648 S.W.2d 80 (1983), as cited in the majority opinion.

**38.** *See Sowders v. Sowders*, 286 Ky. 269, 150 S.W.2d 903 (1941), which held that the mother of a three-year old child should be awarded custody unless proven unfit. This presumption was abolished by KRS 403.270(1); which states that "equal consideration shall be given to both parents." For an example of the contemporary application of this law to custody determinations, see *Poe v. Poe*, Ky.App., 711 S.W.2d 849 (1986).

upheld. Lacey has not sought to have her father's surname stricken, and Jeffrey Smith has *not* forfeited his right to have his daughter bear his surname.

For the foregoing reasons, I respectfully dissent from the majority and would reverse the judgment of the Boyd Circuit Court and reinstate the judgment of the Boyd District Court granting the petition for name change.